Case number 23-7139. United States of America, Ex Rail Terry R. Winnan and State of Texas, Ex Rail Terry R. Winnan and Terry R. Winnan appellant versus Ramiro Lozano, also known as Ramiro G. Lozano Jr. et al. Ms. Simpson for the appellant. Mr. Cass for the appellee's Lozano et al. Ms. McDermott for the appellee rehab care group east. Ms. Simpson, good morning. Good morning, Judge Katsas. May it please the court. My name is Kendall Simpson for Ms. Terry Winnan, the relator in this case. I'd like to focus today on the inapplicability of the public disclosure bar, and even if the bar applied, why relator here is an original source, having added new and material information, and time permitting, a few points pertaining to the sufficiency of relator's claims under 9B. First, the district court erred in applying the public disclosure bar to relator's claims against rehab care because there was not a public disclosure of the fraud that is the basis for her claims, and even if there was, relator is an original source. This case involves a unique who, rehab care, and the specific SNFs, a unique when, January 2009 through at least 2016, and a unique where, these specific SNFs in South Texas. Indeed, this case involves entirely distinct claims, which are the sine qua non of the False Claims Act, the word issue in Halpin. The public disclosure bar was intended to prevent parasitic plaintiffs, and that underlying policy is not implicated by a relator who brings unique claims based on information she learned in her job, not from the face of a prior lawsuit. So, what do you really distinguish between the Halpin case? Because you have only a lot of overlapping time periods, and I think it was, by calculation, less than seven and a half months of the overlap. So, you're looking at what's material during that period of time, or are you suggesting that overlapping in the Halpin settlement, that they were materially different claims as well? Your Honor, thank you for that question. We are suggesting that notwithstanding the overlap in the period of time, that the two actions are sufficiently different to preclude the application of the public disclosure bar, including the time frame in which they overlap. Well, you've got several chances to amend your complaint, but the district still felt like you didn't meet the sufficiency or adequacy of the allegation. So, can you tell us what you believe they were still looking for? Because you do have a federal Rule 9b particularity. Yes, Your Honor. Would you like me to move to the 9b sufficiency allegations argument then? Okay. Your Honor, our points there are that the district court did err in dismissing claims against the Appellees, specifically Lozano, Ballantyne, and the Sniffs, first for using illegal remuneration to induce patient referrals. And there are really two buckets of analysis that are applicable in 9b. We have the remuneration allegations, but then we also have the upcoding allegations. But to take on the remuneration allegations first, a few discrete points here. Appellees rely on Nunnally, a Fifth Circuit opinion, for the proposition that actual inducement in this case, in the form of actual referrals, is an element of an AKS violation. And this was something that the district court relied on in its opinion as well. But Nunnally was rejected by the Southern District of Texas and Parikh, citing the decision as unpublished, not binding, and at odds with both the language of the AKS precedent applying that statute and even itself. Parikh explicitly concluded that the AKS makes it unlawful for a defendant to pay a referral, whether or not a particular referral results. So to the extent the district court was looking for that, that is an error. And Relator has pleaded facts, both as to marketing gifts and medical directorships, that adequately allege an intent to induce a referral, and thus reliable indicia leading to a strong inference that false claims were submitted. But I think the issue has to do with the connection. You know, to indicate that there was a definite increase in referrals, that you can tie the gifts, the marketing scheme, the medical directorship, directly to the patients that increased during that certain period of time. Yes, your honor. And under the AKS, it's more about the intention to induce the referrals, which is what Parikh made clear, as opposed to the actual referrals that result in itself. And from the facts that Relator has pleaded, we say there's reliable indicia that lead to the strong inference that false claims were in fact submitted, such that they were tainted by that intention to induce those referrals. And I'm happy to go into some of those facts if that would be helpful. But in the case that you cite, the Parikh, wasn't there evidence of the actual medical referral, or the allegation of the actual tying to the patient? A little more specific, I think, is what the district court is trying to get you to. Not just saying, oh, on these occasions there were lots of gifts provided, and therefore there must have been an intent to influence, without tying it to during that period of time there was actually an uptick in the increase in patients. Your honor, I'm not entirely certain about the specifics of whether or not there was proof in Parikh of actual referrals that were induced as a actual referrals that were induced as a result of the remuneration that was offered. But the legal standard that Parikh established was that that's not required, and they cited the plain language of the AKS for that proposition. The facts that we believe lead to that reliable indicia, as far as the marketing gifts are concerned, is that for years these SNFs paid out thousands of dollars in self-proclaimed marketing gifts, and they were specifically targeted at hospital personnel in a position to refer patients to the SNFs. And this is important. That was all done against the backdrop of a Medicare regime that requires SNF services to be ordered by a referring physician. There are also allegations that the SNF sought to increase the Medicare census, and at least four of these referring physicians were also hired and compensated as medical directors. Turning to the medical directorships as shams, Empire Spanish Medicine Brownsville employed five medical directors, despite having fewer beds than the Cady facility, which employed one. The San Antonio facility employed multiple medical directors simultaneously, notwithstanding the legal requirement to only employ a medical director. The Cady facility paid one doctor as a medical director and also an additional $3,000 per month as a nursing consultant. The medical directors were paid amounts invoiced, notwithstanding the fact that those invoices contain no information about time worked or services rendered. And we know that there was an increasing outlay of costs for these SNFs paying these medical directors ranging from 2009 to 2012, and we contend that these facts collectively plead reliable indicia that the SNFs submitted false claims tainted by illegal remuneration. Turning to your question as it pertains to the upcoding allegations, I would point the court to U.S. ex-Royal Harris v. Bernard as informative. The citation for that is in our brief, but just for your convenience, it's 275 F sub 2D 1, and specifically looking at pages 7 through 9. In that case, the government alleged that defendants engaged in upcoding, but they submitted claims with codes that represented a level of care higher than the defendants actually provided. The government reviewed the defendants' Medicare billings, which is publicly available information, and from that computed that Dr. Bernard had billed 92.68% of his claims at the two highest levels, levels 4 and 5, and the defendant entity billed 94.32% of its claims at these levels. The government then buttressed these statistics with 12 sample patient cases, which the district court to your question, Judge Childs, is one of the things that it said it was looking for and it seemed to be lacking from Relator's case here, but I think the implication that was made in some of the briefing is that those 12 patient sample cases were provided to offer information about those patients' medical conditions and to show why the upcoding was unnecessary, but that's not what those 12 patient sample cases offered in that case. Instead, the government showed that Dr. Bernard had administered and documented, and here we have an analogous allegation. Specifically, we've pointed to rehab care invoices cited by the Relator showing that while the SNFs were billing exclusively for higher reimbursing levels of therapy, rehab care was providing patients and invoicing the SNFs for lesser levels of therapy, and if this was enough to survive in Bernard under Rule 9b, we contend that it is also enough to survive here. How do you get to original source? So original source, thank you for that question, is an exception to the public disclosure bar issue, which is a slightly different issue than what we've been discussing, so if I could, I'll turn to that. We get to original source as an exception to the application of the public disclosure bar, so it assumes at that point, that inquiry assumes that the court is in agreement that the allegations are substantially similar between Halpin and here, and they say that's fine, but there's also a chance to survive that finding if the Relator has brought new and material allegations, notwithstanding the fact that they are substantially similar to those alleged in disclosure, and here we contend that that is the case. Whose burden is it to plead and prove original source? I would think it's yours. The public disclosure, the application of the public disclosure bar is an affirmative defense. Public disclosure bar is an affirmative defense, but original source is an exception to the defense. Correct. So to the extent that that is our burden, we contend that we've met that. Okay. First, Relator's knowledge was independent of any purported public disclosure, which we claim at pages 20 through 21 of our brief. What is the information for which you claim to be an original and independent source? I had thought it was just this Exhibit E of your complaint. We also look, I believe it's Exhibit G to the complaint as well, which are some rehab care invoices that we cite to. Your Honor, I'll point you to Joint Appendix 50 through 51 as kind of laying out where Relator learned of her information that is independent knowledge, specifically that she came to allege in her complaint via her access to the invoices sent by rehab care to Appley Sniffs. She ran internal reports as part of her job duties based on monthly available. 50 and 51? Yes, Your Honor. That's where I am. And at the top of 51, you cite to Exhibit E. I would also point, Your Honor, to Exhibit G as well. But yes, that is the relevant citation that I have prepared for you today. The second prong of that inquiry, if you're ready for me to move on to it. Can we just back? Well, go ahead. Why don't you finish up on original source, because I want to ask you about public disclosure also. Yes, Your Honor. Thank you for that time. The second prong, an inquiry relevant to the original source exception, is that Relator's allegations are material additions to the allegations in the help and complaint and intervention. This circuit has not yet defined when information is material for purposes of the original source exception, but other definitions may prove helpful. And they include whether they would affect the government's decision-making, whether the allegations, the new allegations are significant, and whether they add value for the government. In our case, Relator has materially added at a minimum to the who and the where, adding sniffs both as defendants and as novel locations for the fraud, who are neither named specifically nor referenced abstractly in the help and complaint, nor are they amongst the 498 sniffs in the help and settlement. And we contend that this standing on its own is sufficient to apply the exception. Well, one thing that seems pretty clear from the case law that goes your way on materially add, that recognizes materially add can't collapse into substantially similar. Yes, Your Honor. And yet those cases say one thing that doesn't count as materially adding is just providing an additional instance of a disclosed pattern of fraud. Yes. This would seem to fit that to a tee. Your Honor, I would disagree with that for the following reasons. So in the help and complaint, and I think what you're getting at is it's really is the mechanism of fraud is that a therapy provider inflates the codes to, you know, either give treatment that's a little bit unnecessary for the last 10 minutes or they didn't give the treatment for the last 10 minutes and passes that on to the SNF, who builds the government. And that's the scheme we're talking about. And the bad actor we're talking about is rehab care. And the allegation involves 500 SNFs. And that's not enough to make the government suspicious that if you have an SNF dealing with rehab care on rug codes, like maybe you should look at that. So I think what the relevant inquiry is and what I would point you to is not so much as is the government suspicious of rehab care's conduct. Is it on the trail rather of the particular fraud that Relator has alleged here? I agree with you and we concede that at the highest level of generality, the conduct that's at issue, particularly as it pertains to rehab care in the help and complaint is similar to that which is here, but the transactions in the false claims are not. And that matters because in the help and complaint, you are taking issue with rehab care's conduct. As you pointed out, there are 23 SNFs identified in that complaint. The 498 SNFs are identified in the settlement. There is nothing from the face of the help and complaint or from the face of the help and settlement that would put the government on the trail of the fraud that Relator has alleged at these specific SNFs in South Texas. And this is important, is that the false claims, the transactions that are at issue in Relator's complaint are claims that are submitted by the SNFs. Those claims do not make that connection. There's nothing on the face of those claims that make that connection with rehab care between SNFs, these SNFs and rehab care, suggesting that rehab care is involved in the provision of therapy at those SNFs. It is that information that is specific to Relator's role as an insider. She is the one who is able to connect the dots because the government cannot, it cannot be on the trail from claims that don't make that connection for it. Sorry, let me make sure I understood that. The claims that these SNFs would have submitted to the government for payment that you say are fraudulent, they say this is for treatment to one of our patients provided by a therapist with whom we contract for such and such therapy, for such and such service, for such and such amount, but they don't say that the therapist was rehab care? That is correct. So what these claims do is they submit based on certain reimbursing Medicare codes, you know, whether it's the RUX code, the RUL code, which we've tied to the Cady facility, they submit reimbursements for those codes. And those codes, the different letters in those codes indicate what kind of therapy was provided, the level, the number of minutes. And that last letter is really about the patient's condition and what would have prompted the need for that kind of therapy. Nothing on the face of those claims identifies rehab care at all. But are you splitting hairs with respect to the different codes assessed to these particular patients? Like in other words, how does that fit into the scheme if the health and settlement would have covered certain codes with certain patients and all we have is just a different code with other patients, but it's still the same scheme? So an important distinction there, Your Honor, is that the help and action, this is one of the ways in which they're different. There aren't allegations specifically about, you know, the highest reimbursing codes like what Relator has made here. The help and action is specific to the provision of ultra high therapy, very high therapy, and there's some overlap in the conduct there. But that is actually a distinction and a different level of detail that Relator brings to the table that's applicable to these eight SNFs, again, who aren't mentioned in the help and complaint, who you can't look at the help and complaint and make the connection between them and rehab care, and the same is true for the settlement. But isn't the help and settlement pretty broad with respect to the rug appending? Just generally that particular claim? So what the help and settlement does, I'm sorry. Yes, I understood your question. Thank you, Your Honor, for the clarification. What the help and settlement does is they say this settlement applies to 498 SNFs, and what we're going to do is we're going to appoint an independent review organization to monitor rehab, a sampling of rehab care's contracts with these third-party SNFs. Which contracts that independent review organization is able to access and look over is completely dependent on rehab care's provision of those contracts to them. And so in that process as well, there's nothing from the face of the corporate integrity agreement, the settlement, where we have any indication that, again, rehab care's work with these SNFs in South Texas would have ever been on the government's radar, if that makes sense. If the help and settlement covered certain claims, and then you as the relator are able to just be a little more specific about those same claims that were already settled, does that then get you to a new lawsuit? Well, so these are different claims, and I think that's the really important point that you've raised, which is the help and settlement doesn't take issue with any SNFs claims that were submitted to Medicare. There are no SNFs that are defendants in the complaint. What's different here is that we are taking issue with claims that were submitted by these eight SNFs to the extent they were improperly influenced by either the illegal remuneration or the upcoding. You're welcome. I see that I'm past my time. I don't want to overstep your honors. Okay, we'll give you a rebuttal. Thank you very much. Mr. Kass. Good morning, Your Honor. May it please the court, Luke Kass on behalf of Mr. Lozano, Mr. Ballantyne, and the skilled nursing facilities. I'll be addressing the district court's ruling under 9b, and my colleague Ms. McDermott will be addressing the public disclosure bar on behalf of rehab care, which we would argue equally apply to us. The relator in this case was a former math teacher hired as a bookkeeper, eventually arising to be a controller and an executive assistant to Mr. Lozano. She worked for two of the eight facilities at issue here that she's suing for seven years, and she's amended her complaint three times. And that background is important in two overarching respects. First, despite that insider level of access, seven years, the right-hand person of the chief executive, she has not and cannot plead how this alleged scheme worked. That's the problem. She cannot connect the dots. Instead, she resorts to group pleading and speculation that's implausible in light of alternative explanations. Second, she has no medical experience whatsoever, yet questions the medical necessity of a number of different things throughout her second amended complaint. And just to touch on the standard, I believe this is what Judge Childs was asking about. Rule 9b under this court's jurisprudence is context-specific and flexible. It doesn't preordain a checklist of certain things you do have to have, but it is the who, the what, the when, the where, the how, and then plus a reliable indicia leading to a strong inference that claims were actually submitted. And if you look at the Solicitor General's opinion in Bethany Hospice, they say for AKS-based False Claims Act claims, you need to show specific patients that were subject to those claims. You need to show the doctors that those claims were referred by doctors and you need to show when for each of those two That's a properly pled claim. And that is not evident based on the allegations here. I'll go to medical directorships briefly and hit all the different alleged illegal remuneration. But going to medical directorships, the claim is generally these are sham medical directorships. They just pay them, they refer patients, there's no contracts, there's no invoices. We don't even know if they show up and do work. A couple of different problems with that. There are contracts. They were filed below at Docket Entry 68-3, at least for Dr. Molinas and Dr. Hovere. The contract says for Dr. Molinas, he gets $1,500 per month. He's got to work 10 to 25 hours per month. Dr. Hovere is a little bit more. He gets $5,000. He's got to work a certain number of hours. So there were medical agreements. These facilities are required by CMS regulation to have medical directors. I don't think you can infer, as the relator does, that a certain number of vets means that you have to have a certain number of medical directors. CMS does not specify what the staffing levels are. I think it sort of depends on the facility. So for example, the Katie facility, which services Houston, a large area, they specialize in ventilators. They have a ventilator wing. They have a tracheostomy wing. It's not uncommon to have medical directors for each. If there's an outbreak, God forbid, at one of these facilities, staff or scabies, not uncommon to bring in a medical director to correct those particular issues. Can you talk about the gifts? That struck me as the stronger part of their claim in the directorships. The directorship, as you say, there are very legitimate reasons for giving money to these doctors in the form of having the medical director. There don't seem to be any good or lawful reasons for giving the gifts in connection with your advertising. Well, it sort of depends on the context. A lot of the supposed gifts, I'll use that term, that are listed have to do with, first of all, some of them just list doctors and they don't anything that leads to an inference of fraud if you're providing a medical director with a gift basket around the holidays. Some of them are. There's six or seven or eight of them that are not around the holidays. But it's limited to one facility, the Brownsville facility, and only for a 27-month period, which I think is interesting because if you're alleging an enterprise-wide fraud scheme, this is what they do. This is how they commit fraud and to the taxpayers. You would expect to see that at all eight facilities for the entire seven years that she's been there, not in this just limited area, if it's systemic. Additionally, Your Honor, she doesn't have firsthand knowledge of any of these gifts. She never saw gifts being provided. She never provided gifts herself. She's just relying on this one document that has this list, and I would submit taking it as true that these were provided. She still has to show a referral that resulted as a result of these. And they're not all liquor, Your Honor. I agree the liquor is a bigger red flag, but some of them are lunches. And the inference that she's asking for is sort of a double causation, sometimes triple causation inference. Let's take the Valley Hospital luncheon. Because of that sandwich provided in that hospital basement or cookies or whatever it was, it led to a medical professional referring. That patient was referred to one of the facilities, and that patient was referred to Medicaid or Medicare services. There's three links in that chain in order for her to make a colorable allegation, which is beyond reliable indicia. That's my point there. And if you see a case, Your Honor, like GoHeal, where meals and gift baskets were based on the CMS provides, or HHS-OIG, excuse me, provides guidance on speaker programs and warns about providing alcohol, but they say that is not in itself indicia of an anti-kickback statute. You need to show an ensuing referral? For an AKS-based false claims act? Yes, you do, Your Honor. What makes it unlawful is the gift is given in order to encourage the referral. And what makes it fraud is the knowingly false certification that they implied with those rules. I think for an AKS, that would be true, Your Honor, but for an AKS-based or Stark law-based false claims act, I think she would need to show the referral. Because not all these facilities take Medicare patients. Some of them are private damages. To plead damages? To make out just the false claims act allegation, yeah. I'll touch rug the resource utilization group allegations briefly. She relies on a 2010 report from CMS that has to do with a different time frame than the allegations here, 2006 to 2008. Here we're 2009 to 2016. It doesn't make a finding that the claims were either necessary or appropriate. She just lists out a series of suspicions and says that they received too much therapy or for longer than was necessary, based on the fact that Katie was the highest top 1% in 2014. There's a number of different institutions that are in that top five, top 10 list. According to the relator's theory, any one of those could be amenable to false claims act suits, just by virtue of the fact that they cater to high acuity, large volume patients. She does focus on, as I indicated earlier, about seven months or so that occur after the fact. Are you suggesting that there could not be any false claim act for a period that's occurring after the help and settlement? You know, Your Honor, I was concentrating on the 9B, so I believe it would apply. I just don't have specifics for you. I apologize. But maybe Ms. McDermott can answer that for me. There are no questions. We can yield the remainder of our time. Thank you, Counselor. Thank you. Good morning, Your Honors. Ms. McDermott, please proceed. Your Honor, I am going to answer that question. I'd first like to sort of start with a context, though, in this particular appeal. There's no greater nightmare for a health care provider than to ink a settlement, enter into a five-year corporate integrity agreement, and get a copycat qui tam. It's the first question in the boardroom they'll ask you, or a doctor will ask you, is, if I reluctantly sign this settlement and go through this five-year corporate integrity agreement, am I going to go through this turmoil all over again because of the notoriety of the allegation? The answer is yes. The answer is yes in this case. The nightmare happened. The good news is the public disclosure bar, as the lower court found, aptly applies in this particular situation because of not just substantial similarity of the allegation, but really the sameness of it. It's about medically unnecessary therapy services that have been up-coded to the highest rug level. And there's a consistent, continuous public disclosure of this particular type of conduct, really from 2010, as the second amended complaint. There's OIG reports, there's newspaper articles, some of which mention rehab care. There's also the government's 2015 complaint that asserts nationwide allegations of this exact type of fraud for rehab care and the conduct in all their facilities. There's a subsequent settlement in 2016, medically unnecessary therapy services. And that's exactly what the subsequent complaint is. Whether that was filed in 2017, we don't believe the original complaint's unsealed. So it's kind of not unusual, but interesting. So if you look at the second amended complaint, that's the first time the rehab allegations appear, which we've noted and it's not been applied to the continuation after the settlement, Your Honor, which was your question. And the answer is yes, it should. Because the purpose of the public disclosure bar is to alert the government to the potential of the fraud, not to prove the fraud, not to confirm the fraud, but to give some indication, to put them on the tail, if you will, of potential conduct. It's not to resolve every potential issue associated with that particular party. So some of the case laws suggested the continuation. The Oliver case suggested it could be 40 years in the case of tobacco mispricing. And more recently, Judge Chuck Kinblow in the O'Connor case suggested that the continuation is simply not an element that would preclude application. And there you had a very short period between a declined quitom, here we have an intervened quitom. And in those circumstances, then the continuation was not viewed as significant. Our facts are even more compelling for that point. Did the claims here, would the claims here have alerted the government that these claims involved services from rehab care specifically? I would have thought the answer to that is obviously yes, but your colleague told me no. It seems like it's a pretty important distinction. Well, Your Honor, I respectfully disagree. But there didn't have to be an identification of every claim. Tell me whether or not there was. Well, Your Honor, it's hard to know. The original quitom and happen was filed in 2011. So there was a pre-intervention investigation period. In 2015, the government goes public with a complaint and intervention that's nationwide. And I think that's enough under the public disclosure bar to presume the government's aware of all of the facilities that rehab care is associated with. And in fact, it's highly likely if there's to be any inference at all. But we don't have to prove that under the public disclosure bar. The very fact that alleged a nationwide scheme involving a thousand of their facilities would be sufficient to invoke the public disclosure bar. The government is on the tail. The government just isn't on the tail, Your Honor. They caught the dog. They leashed it. And it's an obedience training. If you look at what's happened in 2016, which is both the settlement and the corporate integrity agreement. So, yeah, I understand that if you start from helping you start from this case and the government is getting the government is getting claims from an SNF and the claim just says we we engaged a therapist to provide the following services. Does that tend to alert the government that this might implicate the pattern addressed in the other case? I'm not sure. Well, Your Honor, in this case, we have a corporate integrity agreement as the Sixth Auditing. And it's not just external auditing of random sampling. It's also internal auditing is mandated training policies and procedures all focused on medically unnecessary services. So in that context, again, the government has the provider, you know, wrapped in and review investigation and auditing. So that might be a great argument to get your primary client rehab care out of this case. But right now at the podium, you're speaking for the SNFs as well. Well, Your Honor, on the SNFs, I think that when you look at you really you have to be providing therapy to somebody and the patients from the SNF. Providing therapy is very different from providing therapy through rehab care, which is the subject of this now notorious nationwide settlement. Well, I hope we agree, Your Honor, that for rehab care, we're out. Spotting purposes of my question. Understood. I think that in the context of the allegation, you can't have medically unnecessary therapy related to upcoded rugs unless it's done in a skilled nursing facility. So I think it's completely realistic to expect that if the therapy provider has provided medically unnecessary services, although they deny that, that anyone that's their customer is in the zone of alertness, the zone of potential. I called zone of alertness. There's a lot of cliches, Your Honor, but alerting the government to the potential for wrongful conduct. And I think that in that context, the rehab provider and the skilled nursing facility are together. So if I were representing the skilled nursing facilities, I would say they are equally a beneficiary of the public disclosure bar. But for rehab care, we had a lot more. We had newspaper articles with the Wall Street Journal in 2015 that did mention the... I understand it's to rehab care. Judge Shaw, is there anything else? Judge Edwards? Okay. I see. Thank you. Thank you, Your Honor. Did you have a conclusion? Oh, Your Honor, only that I don't think we're rescued by the original source, and we would urge affirmance of the lower court's finding and dismissal. Thank you, Your Honor. Just a few points, Your Honor. Thank you very much. First of all, I want to point out that the amendments that were done at the district court level were not in response to dismissal in regards for a 9B sufficiency analysis. They were to add defendants, to add allegations. In the First Amendment, and for the Second Amendment, to remove information that was inadvertently included. As far as the gifts go, I do want to make sure that we don't fall into the trap of minimizing exactly what those gifts were. The complaint details marketing gifts from Empire Spanish Meadows, yes, which, by the way, remuneration is a collective issue. I don't want to parse out which type of remunerations apply to which entities for purposes of the actual allegation itself. But specific to the marketing gifts, they were given specifically to physicians and hospital discharge personnel in positions to make patient referrals. Those patient referrals, as my colleague noted, are a prerequisite for patients to be admitted to a SNF. The gifts included advertisements for the ballet school for a physician's daughter, liquor for physicians' personal and marketing meals. They are self-described as marketing, and I'm not quite sure what purpose would come from marketing other than please send us your patients. The total value of those gifts over the course of two years was significant. It was not de minimis. It was totaling $23,463.81. And the most plausible and the most reasonable inference, and the one in light most favorable to relater here, which is what 9B requires, is that these gifts, identified by date, amount, and recipient, were intended to induce patient referrals. The upcoding... Do you need to show ensuing referrals? No, Your Honor, we do not. Just as I stated in my initial argument, the AKS does not require actual referrals as a showing. Not for liability under AKS, not for the fraudulent certification aspect of this, but what about for damages under the False Claims Act? Well, we've... As far as damages under the False Claims Act go... You have to show that the government suffered a monetary loss. What is required at the 9B stage is the more lenient pleading standard that this court adopted in Heath, and that is that actual claims aren't required not for purposes of surviving 9B, not for purposes of damages. It's to allege that there's reliable indicia leading to the strong inference that false claims were submitted. Once we get further down the road, sure, the probative requirements are different, but at this stage, Heath controls. Any other questions from my colleagues? Okay, thank you. Thank you, Your Honor. Case is submitted.
judges: Katsas; Childs; Edwards